Good morning, your honors, and may it please the court. Alex Potaman on behalf of Gerhard Hollatz. I'm going to try to reserve two minutes for rebuttal. I will keep my eye on the clock and apologize about my voice. I will try to keep it up and audible. The government agrees that the district court aired an imposing condition 30, which is the computer content restriction. The remaining question is whether the court should also vacate the 2,000 foot residency restriction in condition 31. For three reasons, the residency restriction should be vacated. First, the district court never analyzed whether 2,000 feet was the appropriate distance that would not unnecessarily infringe upon Mr. Hollatz's liberty. Second, the district court did not conduct an analysis that was individualized to Mr. Hollatz and instead relied on a script it had used in other cases that contained facts and analysis that was not pertinent to Mr. Hollatz. And finally, it was substantively unreasonable for the district court to impose a condition that will effectively prevent Mr. Hollatz from living anywhere in greater Los Angeles or any other city for the rest of his life. This is an extreme condition and it was not warranted on the record here. So I'd like to start with the district court's failure to analyze the proper distance. What this court said in Rod is that when a district court is imposing a distance-based residency restriction, it is necessarily choosing that specific distance over other potential distances or other potential approaches. Do you agree that the court adequately explained why he was rejecting the direct view condition in relation to the residency restriction? I do agree with that, with the caveat that, you know, much of the analysis was not specific to Mr. Hollatz's case. But the issue, Judge Sanchez, is that it's more about the 2,000 feet itself and why he didn't explain that distance as opposed to a different distance. So a slightly different direct view was not an issue in this case. Nobody was asking for direct view. The district court said up front towards the beginning of the hearing, I'm not going to impose direct view because I have a problem with it being indefinite. And the defense accepted that and said, okay, we accept that, but we would ask that the definite restriction that you impose be a shorter distance of either 100 feet or 500 feet. The district court never acknowledged that request and it never addressed it. It just went on to conduct this whole analysis of direct view, even though direct view is no longer on the table. And its reasons for rejecting direct view all went to a lack of definiteness. It said that, you know, I think there's ambiguity in a direct view condition. I need a bright line for the defendant to follow. Nothing in that went to how expansive the definite restriction should be. What about his public safety rationale that he described? And I think it might have been part of that script or maybe in his own discussions. So, I mean, the district court talked about a lot of things, you know, some of which I think even the government agrees aren't pertinent to Mr. Hollis's case, like the need to protect latchkey children on Skid Row. I think the district court's public safety rationale, it was from his script and it was only at a very high level of generality. And entirely missing from that discussion was why 2,000 feet instead of 500 feet? Where was Hollis living at the time? He was living in New York at the time of the violation. So, he moved out to California for the hearing? I mean, did he just come out to attend the hearing and was going to go back to New York? Or did he move out to California? So, he had been living in California for most of the time. He was on supervision in 2022, shortly before the violation here. He obtained permission from probation to move to New York to be closer to his brother who lives in New York. And that's where he was living at the time of the violation, but he's still under supervision in, well, I guess they transferred supervision, but they brought the violation here in Los Angeles. So, yes, he came here for the hearing and that's where the hearing took place. Do we know where he would be supervised after his term of incarceration, after this sentence? So, the terms imposed by the district court require him to reside in this district unless he gets permission to move elsewhere. It's my understanding that he does intend to reside here. He intends to stay in Los Angeles. He has family here. And, you know, as the court said in Collins, that's a problem because these 2,000-foot restrictions essentially cover all of greater Los Angeles. And it's not going to leave him with any place to live. And I think that's an undisputed fact in this case. So, then the question goes, is that a reasonable restriction? Well, I think if the district court had just come out and said, as a condition of supervisor's release, Mr. Hullitz may not live anywhere in greater Los Angeles because it's a dense city and there's children around, you know, I think it would be very obvious that that's not tailored to ensure that it doesn't infringe more of his liberty than reasonably necessary. And so, the fact that it's... Can I ask this? In Rudd, or applying the rule from Rudd, does it mean that if council always suggests a different alternative, you know, distance for residency restriction, that the court must undertake an analysis of which is preferable? I think probably yes. What if council doesn't suggest a restriction length? Does that change things? So, Rudd says the district court has to explain why it has selected that particular distance. I don't know that that rises and falls with whether the defense requests a different distance. But when a defense does request a specific distance, both Rudd and I think just the general rule that district courts have an obligation to address non-frivolous sentencing arguments require the district court to address that. And what happened, I think, was the district court came into sentencing with this script that was written to reject a direct view condition. He maybe got thrown for a loop a bit when council said, well, we're fine with no direct view. We just want a definite restriction but a more limited one. And he instead charged ahead with reading this script that was all directed to direct view and didn't address the arguments that were actually being made. What are you asking us to do? So, Your Honor, we're asking to vacate the condition. I think it's substantively unreasonable. I think it can't stand on this. What if we send it, well, you want us to go on to say it's unreasonable? Your first argument is procedurally incorrect. Can't stand because he didn't do the analysis that you're suggesting. So, what if we send it back and, you know, he adds, he focuses on the defendant's particular situation, his prior, you know, the offense, the circumstances of the prior of the offense, maybe the violations, and he does his best to sort of link the distance to the defendant and imposes 2,000 feet again. Then it comes back up to us and then we look, ask whether or not it's substantively reasonable. Is that how this is going to work? So, you know, I think the court can reach this subject of reasonableness question now and perhaps it would be beneficial to do so. And I think under Collins, it's clear that this is not a reasonable condition. Collins said that there's good reason to suspect that this condition is substantively unreasonable for someone in Collins' position who was actually being sentenced for possessing child pornography and had recently admitted that he had committed a contact offense. That's very different from the case goes back to the district court. That's one of the reasons that we asked for reassignment. And it's not a request that we make lightly, but if the district court reimposes this condition, even if it gives different reasons, I think given this district court's track record with this specific condition, there'll be reason to doubt whether that's truly based on a faithful application of Rudd and Collins or at least a reasonable observer could question that. But why? You know, reassignment can't be just because you might predict the court to resolve things a certain way. There has to be a little bit of extra, don't you think? What's the difference? What would be the basis for reassignment to a different judge? So I'm mindful of my time, but I'll answer the question. I think the extra thing here is that we have a district court decades after Rudd and Collins where I think sent a clear message that this condition should not be being imposed willy-nilly. You have to reserve it for really extreme cases. This district court appears to be imposing it across the board and apparently feels so strongly that it should be imposed that has gone to the trouble of creating this multi-page script that it is reading in multiple cases as the supposed individualized analysis that's justifying it. And so, you know, I think that that combination of factors suggests that the district court will have trouble putting out of its mind its commitment to this restriction. And so... Is this district court routinely imposing the 2,000-foot limit in child porn cases? I think, yes, Your Honor. We cited a number of them in our brief and the government hasn't identified any case in which that was before this district court judge in which he has not imposed it. So I think as the case comes before this court, the record seems to show that, yes, he is applying this across the board and... Is it unique to this particular district court judge, this district judge, or is it this condition being imposed throughout the district, you know, by other district judges? So I don't claim comprehensive awareness, but it's my understanding that he is the only judge in the district or at least one of only a handful that regularly imposes this condition. And I think we can see that from the fact that if you look at all of these cases, this court's recent cases with respect to this condition, they're all coming from this one district judge. So I think that's a pretty good indication that he's an outlier compared to the rest of the circuit. Reserve nine seconds. Thank you. Good morning, Your Honors, and may it please the court. Joseph Guzman on behalf of the United States. I'd like to go straight to the record in this case because I think that there is some disagreement here as to how serious this particular defendant is. And the defense counsel minimizes the history and the record of this particular defendant, starting with his original offense, which involved not just a touching offense, but a pretty dramatic and aggressive touching offense. He took a child that was 14 years old to a hotel room, dressed him in diapers, wrapped him in plastic, took pictures of him, and before that had already told that child what he was going to do while for over a month he sent 20 different messages to him on AIM. That's how this case started. Now, in that particular PSR, you'll also see the defendant admitted to having sex with another 14-year-old boy. That is how this case started, and since that time and since the punishment was over, the defendant has not been a model citizen on supervised release. There are four violations here, two of which are extremely concerning. The first violation occurred only two months after he was released. It involved him being in a room with a child and not telling the mother of that child the nature of his actual offense. He told the mother that he had an internet-related offense, but did not tell the mother that the offense involved having sex with a child around his age. The third violation in 2014, the defense counsel refers to this as conversing with the mother and her child at a public laundromat without telling the mother about his conviction. There's a lot more to that story. Again, for over a month, this defendant visited that laundromat specifically because he knew that that mother and those two children would be there, and he went at the exact time that he understood them to be there, which is around closing time. The defendant admitted that he was trying to befriend the mother because she had children, and he did. He got her phone, and the only reason why that violation report ultimately came to the court is because the neighbor, who knew that he was a registered sex offender, saw him with two children, those two children who, by the way, are four and six, outside the laundromat, handing them candy and touching them on the head. Mr. Guzman, let me ask you this. What is it about that record that indicates that 2,000 feet is the appropriate distance that should happen for a residency restriction? Because I, you know, we're all familiar with this record. The problem is neither the government nor probation recommended this type of condition. It came from the court itself, and there doesn't seem to be an explanation as to why 2,000 is the appropriate distance as opposed to what counsel had proposed. So help us. Is there something that we could infer from the record that would support a 2,000 foot restriction? Certainly, Your Honor, and in fact, I think that the district court judge made a specific finding on the 2,000 foot restriction in ER 48, and it was a finding where this court has upheld that similar finding in De Los Santos 1 and De Los Santos 2 and Carrasco. And I think there's a key difference here between this case and the prior cases. In this case, we have not only an offense in which the district court is sentencing somebody in the first instance, we have four violations which show that the defendant was getting increasingly dangerous over time. Probation department, several times in their reports, talked about how the defendant's actions are escalating. The district court used that language in this particular sentencing hearing, talking about his concern about the escalating nature of the offense. In the fourth probation violation report, the probation wrote, probation department wrote, the defendant's conduct is not a lapse in judgment. It is egregious, premeditated, and calculated deceit. This is in CSD 60. Given defendant's criminal history, defendant poses a significant, if not imminent, risk of a free defendant. The district court heard those statements by probation, and I think that the district court issued various punishments throughout the four violations, and it got increasingly serious, and finally the district court decided on the fourth violation report he was going to try something new, because clearly the prior sentences were not preventing this individual, the defendant, from harming children. But I guess the difficulty I have with that argument is a similar thing happened in Rudd, where there had been reasons to impose some type of a condition based on the defendant's actions in that case, but that wasn't enough to explain why a 2,000-foot restriction was appropriate as opposed to a different type of condition. So I grant you, I think, you know, he conceded violation and some type of condition should be But it's still murky why it would need to be 2,000 feet. It just seems to be difficult to square what the court did here with what Rudd requires. So there's a few ways to distinguish this case from Rudd. So first of all, as I mentioned, Rudd involved the initial sentencing of a defendant, and so in that particular instance, there was no record in front of the court as to how this person would perform on supervised release. Secondly, in Rudd, the district court did not provide any reasoning whatsoever for residency restriction of any amount of feet. That's a key difference. And in fact, when this court has sent these cases back, it is often because there is no actual explanation whatsoever on the record. And here you can look at ER 36 to 37, ER 47. In the midst of this alleged script, the court is identifying specific facts on this individual. The district is well aware of this defendant's history, and he references those things throughout this so-called script. You know, the script, his use of a script, I mean, a little bit. I used a script at times when I was a district judge to make sure I covered all my bases. You know, I didn't want to overlook something. Absolutely, Your Honor. A checklist kind of thing. But he's got a script here that doesn't really seem, it's not really tailored to this particular defendant. And he said, you know, look, for example, you know, if you go to his explanation, when he says, I find that when he first says he finds the, within sight, whatever the prior restriction was, you know, it's just too ambiguous. There's no certainty in that. So he wants to impose some certainty. So there's no ambiguity. And then he says, you know, one of the things, a couple of things that caught my eye. You know, if his proposed residence is located within Skid Row, was there any suggestion that he was going to live in Skid Row? Your Honor, I'm glad we're talking about that issue. There was no suggestion on the record that he would live in Skid Row. But if you look at what the court was articulating, he's articulating a concern about children of low-income families, children that have maybe a single parent, who probably have to rely a little bit more on walking more than 2,000 feet to school, to a public pool, maybe even an arcade. And the defense counsel talks about how it would be, it's not likely that children will be walking 2,000 feet to a public pool. That may be true for children that have a pool in their backyard. And I think what the district court is articulating, when he's talking about the latchkey children, even if it's not articulate, he's expressing a concern about children who do have to walk 2,000 feet, perhaps to school, perhaps to take a bus to school, in part because their parents may not be able to take them to school, or they may not have a nanny that can take them to school. And with respect to the script, Your Honor, I agree, it is not a script, it is a list of factors. And the list of factors... Well, I didn't say it was a list of factors, it was a script. I'm saying I think it's a list of factors. I think that's the appropriate way to classify it. There's nothing wrong with using a list of factors, and I'll point out that the list of factors demonstrates that this judge is, in fact, taking his lessons from this court. That list of factors is incorporating what this court decided in Rudd and other decisions. So I have some other problems with this particular condition. One, I mean, obviously, I mean, I think imposing a standard 2,000 feet, regardless of the nature of the individual defendant before you, is contrary to the principles of sentencing. We, you know, we have individualized sentencing. But the restriction says that the offender shall not reside within 2,000 feet of, and then it lists a few things, but then it says, or other places primarily used by persons under the age of 18. So that, to me, I'm not sure what that means, but it certainly seems to me that it would cover malls, shopping malls, grocery stores, places where, I mean, sporting events, the circus. I mean, I don't know how he could decide where to live. And I'm, in Los Angeles, if he's going to live in Los Angeles, I don't know where he's planning to live. But it seems pretty difficult to find some place that's not going to be within 2,000 feet of a place where people under 18 go. Movie theaters, that's another one. I mean, Pasadena. I understand, Your Honor, and in fact, I think that same concern was raised in Rudd, and I'll give the same answer, which I think still applies. We have to look at Condition 31 in the full context. In this paragraph, the sentence after this particular concern states that the offender's residence shall be approved by the probation officer. That means that the probation officer has to decide if it's okay. And therefore, the defendant can propose different residencies, and then the probation officer can decide. That will take care of the vagueness issue. And if I can, I know my time is up. I just want to remind the Court, in ER 47, in the midst of this list of factors, the defendant raises, sorry, the district court identifies specific issues about this defendant. So it was not generic reasons. And if I can close with this, it's that after 15 years of supervising the defendant, four violations of supervised release, and by my count, over 110 pages of reports about this defendant's violative conduct and underlying offense, this district court concluded reasonably, and it's certainly not illogical for him to do so, that this is, in fact, one of the most dangerous sex offenders, and the 2,000-foot restriction should apply to him, if to any other of the defendants that this Court has considered. Thank you. Thank you, counsel. I'll give you a minute. Your opposing counsel took a minute. Thank you, Your Honor. Just a few brief points. I'll pick up where counsel left off with the other condition that the probation officer approved his residence. That condition should be sufficient to ensure that he's not living too close to some place of concern. The only thing this distance-based restriction is doing is imposing an additional restriction on top of that that says, even if your probation officer would think this location would be okay, you can't live here because it's within this arbitrary distance. I think that exemplifies why the the government also talked about the list of factors and that the Court was taking guidance for running Collins. I think what happened here is the opposite of running Collins. Running Collins say you need an individualized analysis, and I think it's clear that the district court was using a script here. It was not an individualized analysis. And finally, I'll just say it's notable that the government, even now, doesn't say that it thinks it's necessary to banish Mr. Hollitz from living anywhere in greater Los Angeles, even as it doesn't dispute that that's the effect of this condition. I think it's an unreasonable condition and I would ask the Court to vacate it and we would renew our request for a reassignment, a remand. Thank you. All right, thank you very much, counsel. United States v. Hollitz will be submitted.
judges: WARDLAW, PAEZ, SANCHEZ